## RYAN vs. MARTIN.

M. retained R. and C. as solicitor and counsel in a suit pending in a district court of the United States, and entered into a written contract with them severally, that, if successful in said suit, he would pay each $5,000; if he recovered over $100,000, he would pay each ten per cent. of the amount recovered; if the case were carried to the supreme court, and the amount paid them as above were equal to $15,000, they were to make no additional charge for services in that court—otherwise each was to receive an additional sum equal to five per cent. of the amount recovered; but in no case was their compensation to exceed the amount recovered. M. further covenanted that said suit should not be settled, compromised, discontinued, or taken out of court or from the control of R. and C., without the payment to each of them of $15,000. In an action by R. against M., founded upon the last mentioned covenant, it appearing that M. was a lawyer; that his said suit was of such a nature as would clearly render it te-

Ryan vs. Martin.

dious, difficult and expensive; that the amount of his recovery, if successful, was uncertain; that he was poor and unable to take the whole risk of the litigation ; and that he entered into said contract deliberately, after full opportunity to consider it in all its details : *Held*, that there was nothing in the contract itself, or in the circumstances attending its execution, which should lead the court to refuse to sustain an action upon it.

Before said suit was finally disposed of, a disagreement having arisen between R. and C. about other matters, C. refused to consult with R. out of court, and thereupon R. advised M., that it was essential to his (M.'s) interests either to induce C. to withdraw his refusal or to dismiss from the case himself or C., as he might elect, and employ some other gentleman with whom his remaining counsel could and would consult. M. thereupon requested R. to take no further part in the case, but to leave it to him and C. *Held*, that the advice given by R. did not amount to a waiver of his rights under the contract.

*Held*, also, that there was nothing in what occurred between the parties, at and after the giving of said advice, and before and after the making of said request, (as shown in the case, *infra*,) that can be regarded as a waiver by R. of his rights under the contract.

*Held*, further, that whether or not, as a general rule, an order of court is necessary to terminate the relation of an attorney, solicitor or counsel to a case pending in court, the request of M. to R., above stated, must be regarded as taking the cause out of his control, within the meaning of said contract.

This court having, on a previous appeal in this action, decided that the contract with R. and C. was several, and that the discharge of R. from his retainer was a breach of it, defendant cannot now be heard to object here, for the first time, to a recovery by R. in the circuit court, on the ground that the complaint, following precisely the language of the contract, avers that the suit of M. was taken "from the control of R. *and* C." If the complaint was technically defective and needed amendment in that respect, the objection should have been taken at the circuit.

APPEAL from the Circuit Court for *Dodge* County.

This cause was before this court on demurrer to the complaint, and is reported in 16 Wis., 57, where the substance of the complaint is stated, and the contract upon which the action is founded is set out in full. The defendant having answered, the case was tried by the judge, without a jury, and brought up by this appeal on exceptions to the findings of fact as well as conclusions of law.

The defendant retained Messrs. *Ryan* and Carpenter as solicitor and counsel in a suit in equity, in the United States District Court, in his favor against De Lorma Brooks ; and entered into a contract for contingent compensation, which contained the

following provision: "Provided however, that in no case shall said *Ryan* and said Carpenter receive anything beyond the amount recovered in said suit. And said *Martin* further covenants and agrees to and with said *Ryan* and said Carpenter, that said suit shall not be settled, compromised, discontinued, or taken out of court, or from the control of said *Ryan* and Carpenter, without the payment to each of them of the sum of fifteen thousand dollars; that he, said *Martin*, will devote his utmost endeavor to furnish evidence and prosecute said suit." Pending the suit, Messrs. *Ryan* & Carpenter had some disagreement about other matters, and Carpenter refused to consult with *Ryan* about the suit, out of court. Thereupon *Ryan* gave *Martin*, at an interview between them, a written memorandum of advice as follows: "24th October, 1861. *Mr. Martin* has just shown me Mr. Carpenter's letter to him of this date, in which Mr. Carpenter, for reasons he assigns, refuses to confer with me out of court in the case of Martin against Brooks. As Mr. Carpenter's complaints are not stated to me, I shall attempt no answer to them. If addressed to me, I could readily dispose of them. But I have now only one duty, and that is to advise *Mr. Martin* in the position he is placed by Mr. Carpenter's refusal. I advise *Mr. Martin* that it will be highly dangerous to his interests, if Mr. Carpenter and myself retain our present relations to his case, without constant consultation out of court upon the various questions arising and the policy to be pursued. I advise *Mr. Martin* that such a refusal, if adhered to, is as much a violation of Mr. Carpenter's duty under his retainer, as if he refused to appear in the case in court, or to do any other professional service in the case. I advise *Mr. Martin* that it is essential to his interests, either to induce Mr. Carpenter to withdraw his refusal or to dismiss one or other of us, as he may elect, from the case, and employ some other gentleman with whom his remaining counsel can and will consult. My own impression is, that Mr. Carpenter's refusal was an act of hasty temper, which his own

good sense will, upon reflection, refuse to sanction and continue."

Mr. Carpenter continuing his refusal, defendant had another interview with *Mr. Ryan,* of which he testifies as follows: "On the 25th, I went to see *Ryan,* and reported to him the refusal of Carpenter after reading *Ryan's* letter of advice to me. At this interview, *Ryan* stated that he had, during the night previous, reflected fully upon the written advice he had given me, and that he was confirmed in the opinion that it was correct; that I had a right, on account of Carpenter's refusal to consult with him, to dismiss either Carpenter or himself, or both of them; and to employ counsel who would and could consult together; that he was well aware that I could not dismiss Carpenter from the case, on account of his being so well acquainted with the facts and details of the case; and that if I should be unable to induce Carpenter to withdraw his objection, he should not think hard of me if I dismissed him." Of these interviews *Mr. Ryan* testifies as follows: "I did not state to *Martin* that, if he saw fit to discharge me, I would not think hard of him, or words of that kind. I was very guarded in saying as little as possible with him on the 25th. On the 24th I spoke freely with him. On the 24th, *Martin* stated to me that the whole blame of the difficulty lay upon Carpenter, and that he had no fault to find with me, and that I had done my whole duty to him under my retainer in the case. I told him that notwithstanding that, if he should elect to dismiss me, who had done my whole duty, and retain Carpenter, who had not done his duty as a whole, I should not consider it any cause of difficulty, quarrel or offense between us—do not know what the language was—if he, on his part, in that event, should behave well towards me, and perform his obligations to me for my nearly five years service in his case; but that, as a matter of course, he could not expect me to be satisfied if I was dismissed from the case for Carpenter's fault, without being protected or satisfied, or some

such phrase as that. *Martin* in some way signified that if he should take that course with me, he would do right by me—I don't know what his phrase was, but he assented to what I said. When I told *Martin* that if Carpenter adhered to his refusal, it was for his interest to dismiss one or other of us, I spoke to him of the value of the services of both Carpenter and myself in the cause, telling him that both were of value to him after so many years of litigation. I spoke to him of the peculiar value of Carpenter in one aspect of the case, and of myself in another. I told him I would not, from motives of delicacy, advise him, if he had to dismiss either of us, which he ought to dismiss. I did not tell him that he could not dismiss Carpenter safely, except so far as that was implied in telling him that he could not dismiss either of us without risk of damage to himself. I am very confident that that was on the 24th, and not on the 25th of October. At the end of the interview on the 24th, *Martin* left me, for the purpose, as he said, of seeing Carpenter, and inducing h'm to withdraw his refusal. He was to meet me again next day at an early hour. On the morning of the 25th I was at my office at the hour *Martin* had promised to call. He did not come. He called later in the day, however, and informed me that Carpenter adhered to his refusal to consult with me out of court in the cause.  *  * He left me agreeing to return at a specified hour the next morning, to let me know his conclusion on the whole subject. I did not then state to *Martin*, I am very confident, any advice, except to adhere to what I had written for him the day before. And I certainly did not tell him then, that he could not safely dismiss Carpenter. I am sure of that, because in that interview I had for the first time doubted *Martin's* good faith. I came to my office early the next morning, earlier than *Martin* agreed to be there, and remained there steadily through the business hours of the day to see him; he did not come, nor send, nor did I hear from him at all that day. Next day was Sunday. I remained at my house; heard nothing from *Mar-*

*tin.* On the next morning, Monday, October 28th, the letter of *Martin* dated October 27, 1861, post-marked October 28th, was received by me." The letter referred to was addressed by defendant to *Mr. Ryan*, and was as follows:—" Dear Sir:— I did not see you yesterday for the following reasons : 1. Mr. Carpenter had, the afternoon before, gone to Racine, and I could not see him. 2. When I did see him, he wholly declined changing his determination. 3. I needed longer time to determine what I would do in the premises. I have sometimes thought I would do nothing myself, but would leave you and Mr. Carpenter to take your own course. I have had much reflection, of the most serious nature, upon your note of instruction to me, of the 24th inst., and which you repeated verbally to me, after full deliberation, on the 25th ; and much as I desire to do so, I cannot resist the conclusion that your instructions are sound, and that I shall be compelled to follow them. My case is of too great importance to ' pitch ' into without consultation between you and Mr. Carpenter. Mr. Carpenter will not consult with you, and according to your instructions, the correctness of which I cannot doubt, either you or Mr. Carpenter will have to leave the case. I deeply regret this unfortunate difficulty between you and Mr. Carpenter, at a time when I stood so greatly in need of all your combined wisdom and efforts ; but as I have had no part in getting the difficulty up, and intend having nothing to do with it, I hope it may be so managed as not to result in the injury of my case. I will do you the justice to say that you have shown every disposition to accommodate ; you could not have acted more disinterestedly than you did in giving me the instruction, and in assuring me that if, under the instruction, it became necessary to dispense with your services, you would not and could not think hard of me. It is out of the question to think of postponing the case. My circumstances will not admit of it. The argument must be made the coming week, if I have to make it myself. You are well aware that, situated as I now am, I

cannot dispense with the services of Mr. Carpenter. He is absolutely necessary to the argument of the immense details of the exceptions, and of the case. He alone is acquainted with the facts and details. It would take another man six months or a year to acquire the knowledge of the case possessed by him. He has already done a very large amount of work in the case. He wrote the bill and the lengthy briefs. He can argue the case as a whole with ability. I shall not fear to trust it in his hands, and if you are withdrawn from the case, I shall not employ any one else.

I am forced from your instructions, so faithfully and disinterestedly given, and from the stand taken by Mr. Carpenter, to ask you to take no further part in the case, but to leave it to me and Mr. Carpenter."

Under date October 28th, 1861, *Mr. Ryan* wrote to *Mr. Martin*, in reply, as follows: "Dear Sir:—I expected of you to keep your appointment on Saturday, which you saw fit to break, as you had broken your appointment the day before, both to my great inconvenience, as you well know. Your doing so, in connection with other things, prepared me in some measure for your letter of the 27th inst., postmarked and received to-day. There are peculiarities in your letter which I am quite sure are not your own, and which I will not now notice. I gave you, however, no "instructions" as you say. I did give you advice, as your counsel, and at your request, and did so in writing. I have still no doubt, as you say you have none, of the correctness of that advice. It is all in writing, and must speak for itself. I did not say to you that "if, under my instructions, it became necessary to dispense with my services, I could not and would not think hard of you;" but I did say to you that, although you agreed with me that Mr. Carpenter was violating his retainer, and I had not and was not, but had always been and then was ready to do my whole duty to you, whatever Mr. Carpenter's course might be, still if you should resolve to retain him and to dismiss me, I should cheer-

Ryan vs. Martin.

fully submit, if you should deal fairly by me. If, under such circumstances, you see fit to dismiss me and to withdraw the case from my control, adhering to your letter of this date, I submit to your decision ; and if you do so in good faith, abiding by and performing your contract with me, I shall do so cheerfully and without complaint. But in your letter, you not only ignore all the service I have rendered you, but you ignore your agreement to pay me, as if you had the right and power to send me out of the case without compensation. If this was intentional and be adhered to, I shall of course know how to interpret the whole of your recent conduct to me, which would have sooner alarmed me, had I not reposed great faith in your truth and integrity.—I have placed the whole matter in the hands of Messrs. Butler, Buttrick & Cottrill for prompt action. And I must know to-day, from them or you, what your purpose is towards me. And that there may be no mistake, I now notify you that I am prepared to go on with your case to-morrow, and at all future steps of it, or am ready to leave it on your dismissal, you performing your contract with me upon that contingency."

*Mr. Ryan* testifies that he carried this letter, and his contract with defendant, to Butler, Buttrick & Cottrill's office, and asked them to deliver the letter to defendant. Shortly after leaving them, he met defendant, and, in a brief interview between them, the latter asked " What is to be done now ? " *Mr. Ryan* referred him to Messrs. Butler, Buttrick & Cottrill. Defendant testifies as to the same interview, that he thinks he told *Mr. Ryan* that his motive in seeking it was to see if they could arrange for his fee for past services ; but plaintiff declined to converse with him on the subject, referring him to his attorneys.—Afterwards, on the same day, defendant called at Butler, Buttrick & Cottrill's office, and plaintiff's letter was handed to him. Some conversation then occurred, of which Mr. Cottrill testifies : " I stated to *Martin*, among other things, that *Ryan* desired to know precisely where he stood with ref-

erence to the case; whether he was to go on or not, and if not, what *Martin* proposed to do about his compensation. *Martin* said very little upon the subject of *Ryan's* position in the case. He said, so far as paying *Ryan* money at that time was concerned, he could not do it, he had none to pay; and he left me saying he would come in and see me again." Defendant called again at the same office in the afternoon of that day, and had another interview with Messrs. Butler & Cottrill, of which the latter testifies: "The subject was renewed about *Ryan's* position in the case, and, if out, what was to be done about his compensation. Butler mentioned to him [*Martin*] the contract, and stated verbally the clause about the $15,000. *Martin* asked if there was such a clause. Butler said there was. I got the contract, and one of us showed it to him. *Martin* said he had forgotten that clause. We had some talk as to its legal effect. Butler stated to him that the discharge of *Ryan* from the case would make him liable to both *Ryan* and Carpenter for the $15,000 to each. Shortly after, he went away. He said, before he left, that he would let us know the next day whether he would retain *Ryan* in the case, and if he concluded not to, he would see us on the subject of his compensation. I think he was to come the next morning." As to these conversations the defendant testifies: "My copy of the contract had been burned, and I had never looked at it from the time it had been signed until then. When my attention was called to the contract, I was surprised at it. My recollection is, that whether *Ryan* should go on in the case or not, was not the question that Butler, Buttrick & Cottrill wished to see me about at all; but that it was about settling *Ryan's* bill. I can't say whether or not Cottrill told me *Ryan* was ready and willing to go on in the cause. I think I did not take time to consider whether he should or not." On the same day (the 28th) defendant wrote to Messrs Butler, Buttrick & Cottrill that, in regard to the claim of *Mr. Ryan* put into their hands for collection, he should await such action as *Mr. Ryan* advised them to take. He also

wrote to *Mr. Ryan* on that day as follows :—" DEAR SIR :—Yours of this date is received, and I must say I am very much surprised at its contents. In your written memorandum of advice, which you gave me unasked, on the 24th, you say: 'I advise Mr. Martin that *it will be highly dangerous to his interest*, if Mr. Carpenter and myself retain our present relations to his case, without constant consultations out of court on the various questions arising and the policy to be pursued. I advise Mr. Martin that it is essential to his interests either to induce Mr. Carpenter to withdraw his refusal, or to dismiss one or the other of us, *as he may elect*, from the case.' In your interview with me at your office on the 25th, you repeated all that you had written, and further said to me that you thought I could not, with safety to my case, dismiss Mr. Carpenter, because he was so familiar with the facts and details of the case. Believing you meant what you said in writing and by word of mouth, and being unable to induce Mr. Carpenter to withdraw his refusal, I, after full deliberation, acted on your advice, and wrote you my note of the 27th inst. In your letter of to-day you conclude by saying: 'And that there may be no mistake, I now notify you that I am ready to go on with the case to-morrow, and at all future steps of it.' Are you ready and willing to do what will " be highly dangerous to my interest" to have done, or what, quoting from you, "it is essential to my interest" not to permit to be done ? If I could suppose you insincere in the written advice you gave on the 24th, and on which I acted in my note to you of the 27th, I could then understand your letter before me ; but upon no other hypothesis can I understand why you offer to do what you say yourself would be highly dangerous to my interest to have done. I have acted in this matter, from first to last, upon your advice, and I think it rather hard that I must be crushed between you and Mr. Carpenter, made a victim to your quarrels, when I have in no way contributed to any disagreement between you. You know very well that I have no present means to

pay you for your past services; you know equally well that I would not fail to pay you for all your services as quick as it is in my power to do so. The final argument is to take place to-morrow, and you certainly cannot reasonably expect that I shall leave all the interest involved in the case, to settle your bill. Your letter, in denying what I stated from our conversation, and the insinuation that some one besides myself had written portions of my letter to you, is entirely wrong."

This letter was received by the plaintiff the next morning, Oct. 29th, when he answered as follows: "SIR:—Of course I know the meaning of all your recent conduct towards me, and by whom and for what it was set on, and of course you know that I do. But although you decide to leave me to my legal remedy, I cannot let your letter of the 28th inst., delivered to-day, pass without contradiction of some of its mis-statements. It is not true that you were surprised by my letter of yesterday. You read it and commented on it, and on the whole subject between us, without surprise, finding much fault with Mr. Carpenter, and stating that you found no fault with me. What did surprise was, that my contract with you protected me from being left at your mercy. You felt and showed no surprise at my letter, until you had taken advice to be surprised. It is not true that I wrote my advice to you of 24th inst. unasked. You expressly asked my advice, and when I had verbally given it to you, you expressly asked me to put it in writing to show to Mr. Carpenter. It is not true that I said to you that you could not with safety to your case dismiss Mr. Carpenter, for any reason. I fairly told you my views of the use of each of us in the case, abstaining, from motives of delicacy, from any opinion as to which of us I thought of most use, and telling you it was for you to decide whether you would dismiss either and which of us. You left me on Friday to consult a third person, and promised to return to me on Saturday with your decision. I never thought, said, or wrote, that it would be dangerous to retain me in your case. And last evening you begged time

from Butler & Cottrill till this morning, to decide whether you would not still avail yourself of my continued readiness to to act in your case, with which you now find so much fault. The conduct pursued towards me, under the influence avowed by you both to me and to Butler & Cottrill, will readily settle the question in any honest mind, which of your counsel it was dangerous to retain. Time will surely justify that remark, even to you, with all the profit of having wronged me."

This action was brought on the clause of the contract before quoted. The court below found the facts substantially as alleged in the complaint, and held that the plaintiff was entitled to recover from the defendant $15,000, with interest from October 28th, 1861. Judgment accordingly; from which the defendant appealed.

*Matt. H. Carpenter*, for appellant:

Where the relation of solicitor and client exists, any contract with or security to the solicitor is regarded with suspicion. "The presumption is that the transaction is unfair, and the onus of proving its fairness is upon the solicitor." *Evans v. Ellis*, 5 Denio, 640. To sustain such transaction, the solicitor must take the whole burthen of proof, and show that he has given the client "all that reasonable advice against himself that he would have given the client against a third person." Lord ELDON, 6 Ves., 277, 278; *Newman v. Payne*, 2 Ves. Jr., 199; *Mott v. Harrington*, 12 Vt., 199. If a solicitor obtain from a necessitous client a conveyance, it will be considered only a security for what has been actually advanced. *Plenderleath v. Fraser*, 3 Ves. & Bea., 175; *Wood v. Downes*, 18 Ves., 123; *Falkner v. O'Brien*, 2 Ball & B., 221; *Rose v. Mynatt*, 7 Yerg., 30; *Berrien v. McLean*, 1 Hoff. Ch., 421; *Wheelan v. Wheelan*, 3 Cow., 537; *Starr v. Vanderheyden*, 9 Johns., 253; *Miles v. Ervin*, 1 McCord Ch., 524; *Whichcote v. Lawrence*, 3 Ves., 740. 2. On the question of fact, there can be no doubt that *Martin* understood from what took place between *Mr. Ryan* and himself, that he was released from the provis-

ion of the contract, and there is no doubt that *Mr. Ryan* knew he so understood it. *Mr. Ryan's* own testimony establishes this. "I told him * * that if he should elect to dismiss me * * I should not consider it any cause of difficulty, quarrel or offense between us * *, if he, on his part, in that event, should behave well towards me and perform his obligations to me, *for my nearly five* years service in his case. * * *Martin* in some way signified, that if he should take that course with me, he would do right by me. I don't know what his phrase was, *but he assented to what I said.*" This language, translated into legal phrase, is: "I am willing that you should elect to rescind the contract, and settle with me on the *quantum meruit, for my five years service.*" *Martin* could understand this language in no other way; *Mr. Ryan* must have known he did so understand it. "We regard it as a rule of law, no less than of morals, that whatever is expected by one party to a contract, *and known to be so expected by the other*, is to be deemed a part or condition of the contract." KELLOGG, J., in *Jordon v. Dyer*, 34 Vt., 106. What took place clearly amounted to a waiver and rescinding of the contract, if it could be waived by parol and acts of the parties. *Hill v. Green*, 4 Pick., 114, and cases cited in note; *Rogers v. Steele*, 24 Vt., 513; *Green v. Hulett*, 22 Vt., 188; *James v. Cotton*, 7 Bingham, 266; *Hoar v. Clute*, 15 Johns., 224. After the contract was rescinded, it could only be reinstated by consent of *both parties*. *Laton v. King*, 19 N. H., 280; *Cobb v. Hall*, 33 Vt., 233; *Sutton v. Tyrell*, 12 id., 79. 3. The only remaining question is, can an agreement under seal be waived or rescinded by the parties to it in parol? The court below held that parol evidence was incompetent for this purpose; and that the contract in suit could not be rescinded except by an instrument under seal. This is the decisive question in this case. (1.) It is well settled, that a *written* instrument may be varied as to the time or manner of its performance, or waived altogether, by a subsequent parol agreement. *Goss v. Ld. Nugent*, 5 Barn. & Adolph., 65; *Keating v.*

*Price,* 1 Johns. Cases, 22 ; *Cummings v. Arnold,* 3 Met., 486, and cases cited by court ; *Erwin v. Saunders,* 1 Cow., 249 ; *Blood v. Enos,* 12 Vt., 625 ; *Robinson v. Bachelder,* 4 N. H., 40 ; *Grafton Bank v. Woodward,,* 5 id., 99 ; *Richardson v. Hooper,* 13 Pick., 446. (2.) In *Munroe v. Perkins,* 9 Pick., 298, in which it was held that " a contract under seal may be waived by a parol agreement," the court, speaking of the cases in relation to mere written instruments (p. 305), say : " The distinction taken in the argument, between contracts in writing merely and contracts under seal, appears by the authorities not to be important, as it respects the point under consideration ; and justice required in the present case that the parol evidence should be received." In *Lawrence v. Dole,* 11 Vt., 549, REDFIELD, J., delivering the opinion of the court (p. 555), says : " It si a well settled principle in the law of contracts, and equally applicable to all classes of contracts, *where relied upon by way of defense,* that either party may waive, either absolutely or conditionally, any stipulation in his favor, at any time before a breach. 2 Stark. Ev. (6th ed.), 78 ; B. N. P., 152 ; 2 Lev., 124 ; *Gomery v. Bond,* 3 M. & S., 378. In short, this principle is so familiar, and runs so extensively throughout all the departments of the law of contracts, that to cite authority in its support seems like ' heaping demonstration upon the shoulders of demonstration.' It goes upon the ground that where one party has induced the other to *act* upon *declarations* simply, he must be bound by them, although made without consideration, and affecting his interest ever so deeply. Where this alteration is in regard to a condition precedent, and is necessary to be shown by the party afterwards seeking redress upon the contract, it is required that the alteration should be by a contract of as high a nature as the original, else the party performing the altered contract will lose his remedy. *Creig v. Talbot,* 2 B. & C., 179 ; *Porter v. Stewart,* 2 Aiken, 417. *But where this is relied upon by way of defense, it is not material* that the alteration, if made before any breach, should have been upon consideration,

or under seal, in any case; for, if *acted upon*, it is sufficient. 1 Swift's Dig., 288; 1 Johns. R., 22." *Hill v. Green*, 4 Pick., 114; *Ratcliff v. Pemberton*, 1 Esp., 35; *Fleming v. Gilbert*, 3 Johns., 528, and cases cited by THOMPSON, J.; *Porter v. Stewart*, 2 Aiken, 417, and cases cited by PRENTISS, J.; *Cabe v. Jameson*, 10 Iredell, 193; *Baker v. Whiteside*, Breese, 132; *Reed v. McGrew*, 5 Ohio (Ham.), 375; *Dearborn v. Cross*, 7 Cow., 48. Illustrating the distinction recognized by REDFIELD, J., in the opinion above quoted, that parol variation of a sealed contract is good in defense, though it cannot be relied on to support an action of covenant, see the following cases in which it is held *that a deed may be varied or waived by parol,* but that in such event the whole contract becomes one of parol, and the action must be thereon, and not in covenant: *Lehigh Coal Co. v. Harlan,* 27 Pa. St., 429; *Langworthy v. Smith,* 2 Wend., 588; *Proprietors of Mill Dam &c. v. Hovey,* 21 Pick., 417; *Vicary v. Moore,* 2 Watts, 451. 4. The doctrine of equitable estoppel, as applied in all the modern cases, precludes the plaintiff from enforcing this penalty for doing what he not only consented that the defendant might do, *but expressly and in writing advised him he ought to do.* " Where a person tacitly encourages an act to be done, or consents to it, he cannot afterwards exercise *his legal right* in opposition to such consent." *Morris Canal Co. v. Lewis,* 1 Beasley (N. J.), 323. And this doctrine is applied in all cases, and precludes a party from claiming under a deed, or setting up title by deed which is of record to himself, where he has by word or act given others reason to believe that he had no right, or intended to waive it, and they would be prejudiced by his asserting his right. *Blackwood v. Jones,* 4 Jones Eq. (N. C.), 54; *Chiapella v. Brown,* 14 La. An., 189; *Bleven v. Freer,* 10 Cal., 172; *Snodgrass v. Ricketts,* 13 id., 359; *Cochran v. Harrow,* 22 Ill., 345; *Davis v. Handy,* 37 N. H., 65; *Tilton v. Nelson,* 27 Barb., 595; *Corbett v. Norcross,* 35 N. H., 99; *Funk v. Newcomer,* 10 Md., 301; *Nixon v. Carco,* 28 Miss., 414; *Gatling v. Rodman,* 6 Ind., 289; *Wells v. Pierce,* 7 Foster

(N. H.), 503 ; *Strong v. Ellsworth*, 26 Vt., 366 ; *Cary v. Wheeler*, 14 Wis., 281, and cases cited in the opinion of the court. There never was a case so clearly within the reason of this rule of estoppel *in pais*, as this case. The plaintiff was the defendant's professional adviser in regard to this subject matter, bound to advise him fully and correctly, and assumed to do so, giving the defendant solemnly considered professional advice, reduced to writing to avoid mistakes and produce effect : " I advise *Mr. Martin* that it is essential to his interests either to induce Mr. Carpenter to withdraw his refusal, or to dismiss *one* or *other* of us, *as he may elect*," &c.; and told the defendant, as he himself swears, that if he should elect to dismiss him, it would be all right, if he dealt fairly by him *as to his past services in the case*. Can it be possible after all this—after *Martin* acted upon that advice, and only in consequence of it, that *Mr. Ryan* can sue *Martin* and recover $15,000 as for a breach of this covenant, for doing just what *Mr. Ryan* not only consented that he might, but peremptorily advised and directed that he should do ? 5. The breach laid in the complaint is, that defendant "did take said suit from the control of said plaintiff and said Carpenter, and did discharge the plaintiff therefrom and from his said retainer and employment therein, and did direct the plaintiff to take no further part in said suit and to leave the same to him, said defendant, and to said Carpenter." (1.) The provision of the contract is, that the said suit shall not be taken "from the control of said *Ryan* and Carpenter without the payment," &c. To sustain this action, therefore, it must be shown that the suit was "taken from the control of *Ryan and Carpenter*," which is disproved by the testimony. If the covenant be construed in the disjunctive, and be held to read, " the suit shall not be taken from the control of *Ryan or* from the control of Carpenter, without the payment," &c., yet the plaintiff has made the issue in the conjunctive, and charged that it was taken from the control of both. This issue is clearly against the plaintiff, as there is no pretense that the suit was taken from the control

of Carpenter. It is no answer to this to say, that if it was taken from the control of *Ryan* only, there is a breach of the covenant; because that is not *the* breach charged by the plaintiff. He might have amended in the court below, but cannot here. (2). The suit of *Martin v. Brooks,* never *was taken* from *the control* of *Mr. Ryan* as counsel. The relation of an attorney, solicitor or counsel to a cause pending in court, can never be terminated, and the suit taken from his control, without an order from the court. No steps were ever taken by *Martin to take the case from his control.* At most, the letter of *Martin* to *Mr. Ryan* was only a consent that *Mr. Ryan* might leave the case. It did not direct him to do so, nor did it prevent *Mr. Ryan* from asserting control of the case as counsel at any time. It was undoubtedly sufficient authority to *Mr. Ryan* to leave the case, if he chose to do so; but it did not, and *Martin,* by his own act and without application to the court, could not *take the suit from Mr. Ryan's control.* Had *Mr. Ryan* appeared in court, and claimed his position as counsel, after *Martin's* letter, the court would have recognized him as such, unless *Martin* had taken steps to have his relation to the cause terminated by an order of court. *Withers v. Harris,* 7 Modern, 50 ; *Grant v. Baily,* 12 Modern, 440 ; *Powel v. Little,* 1 W. Blk., 8 ; *Lewis v. Sumner,* 13 Met., 271 ; *Mumford v. Murray,* Hopk., 369 ; *U. S. v. Curry,* 6 How. (U. S.), 111. *Mr. Ryan* had, by the con tract between him and *Martin,* an interest coupled with his power as counsel, and " when that is the case, it is *not of course in the power* of the principal to revoke his power, or to disavow the acts of his attorney, done to establish the rights of his principal, *and to increase or secure his funds,* out of which he expects to be paid." By the Chancellor in *Holman v. Holman,* 3 Desaussure, 211. There is a broad distinction here, between such an act on the part of *Martin* as justified *Mr. Ryan* in leaving the case, and such an act as took the case from his control without his consent and against his wishes ; for nothing short of the latter is provided against in the contract. By

the contract, the parties stipulated with great particularity as to compensation for services; but as that compensation was to be governed entirely by the amount of the recovery, it was obviously in the power of *Martin*, when the litigation had proceeded so far as to show Brooks that he must be defeated, to make a settlement with Brooks and prevent a recovery at all, or, by taking the case from the control of his counsel, have a decree entered for a nominal sum, and thus defraud his counsel. To prevent this, it was provided that the suit should not be taken from the control of his counsel without payment of fifteen thousand dollars. Now, so long as *Mr. Ryan* might go into court and assert control of the cause as counsel, and see that a decree was obtained for as large a sum as *Martin* was entitled to, the case was *not taken from his control*, neither in the technical sense nor in the sense of the words as used by the parties to the contract. To test this, let us suppose that *Mr. Ryan* had gone into court after receiving *Martin's* letter, and made any motion, or taken any proceeding whatever in the cause, would it have been in *Martin's* power to complain or object? Or could *Martin* have maintained an action against him for appearing in the cause without authority? If it be said that, after *Martin's* letter, *Ryan's* right to represent him was terminated, it can only be upon the ground that the parol agreement between them, and *Martin's* acting under it, and electing which of his counsel he would keep and which release, was a rescinding and waiver of the agreement in suit; and this action must fail for that reason. On the contrary, if you hold that the agreement under seal *could not be waived* by what was done, then of course it *was not* waived, and *Mr. Ryan's* rights under it (and his control of the cause was one of those rights) remained the same, after the parol agreement and letter of *Martin*, that they were before.

[The argument of counsel on points which the court holds to have been decided on the former appeal in this cause, are omitted.]

*E. L. Buttrick*, with whom was *J. P. McGregor*, for respondent, argued, among other things, as follows: 1. The defendant dismissed the plaintiff, and he now claims that the plaintiff still remained in the case because his name still remained signed as counsel to the bill. No substitution is necessary to change counsel, as in case of a solicitor. But even if the plaintiff had acted as solicitor, the dismissal as proved entitles him to the liquidated damages given by the judgment below. The contract is, that if the case should be taken from the control of the plaintiff and Mr. Carpenter, the liquidated damages should be paid. The dismissal is, that the plaintiff is to take no further part in the case, but to leave it to the defendant and Mr. Carpenter; and the fact is, that under this dismissal, the plaintiff has taken no farther part in the case. If he had had the indelicacy to do so, he would undoubtedly have been excluded with merited rebuke. If this is not taking the case out of the plaintiff's control, it would be impossible to imagine what would be. But we consider this point settled, by the second resolution of the court on the former appeal in this cause. 2. But it is argued that the plaintiff's memorandum of October 24th, 1861, operated as a release, relinquishment or rescission of the contract on the part of the plaintiff. We apprehend not. There was a necessity to dismiss one of the counsel. The plaintiff advised the dismissal of one, at the election of the defendant. That advice was only affirmatory of the right of the defendant independent of the advice. Before the advice and after, he had by law, he had by the contract, a right to dismiss either or both. The advice went no further, not so far. The question here is not a question of the right to dismiss, but a question of the terms on which the dismissal could be made, under the contract. The contract says that the dismissal may be made at the defendant's election, on payment of the liquidated damages. That is to say, a dismissal without cause was subject to the payment of the liquidated damages; a dismissal for cause would not enti-

title the counsel dismissed to the same compensation. Here the plaintiff was not liable to be dismissed for cause; Mr. Carpenter was. It was clearly in this view that the advice was given by the plaintiff, and expected to be received. If the defendant had forgotten the terms of his own contract, the fault was not with the plaintiff. He had a right to assume that the defendant remembered the contract under which both were acting, and would consult and consider it before acting in so weighty a matter. It is inconceivable that the plaintiff designed, or that the defendant understood him to design, to throw away his stipulated compensation for all his labor and risk. But it might well be that the defendant would elect to pay the stipulated damages on the dismissal of the plaintiff, rather than dismiss Mr. Carpenter without such a liability. At all events, he made his election to dismiss the plaintiff subject to the liability; and he must abide by the liability. There is not one word in the memorandum of advice which can be construed to look to a waiver of the contract or of the liquidated damages. And this was clearly the defendant's first view. He had forgotten the clause of the contract providing compensation on dismissal. When pointed out to him, he reserved the right to retain the plaintiff in the case, if he should see fit on consideration. It is very clear that he then had no idea that the memorandum of advice had any intent or effect to waive the contract. Before the interview with Messrs. Butler and Cottrill, in which the defendant was made acquainted with the clause in the contract, he had the plaintiff's letter of October 28, 1861, offering on the part of the plaintiff to go on with the case under the contract, or to leave it on the defendant's dismissal, he performing the contract upon that contingency. With that letter and on that offer, the defendant reserved to himself the election tendered, of retaining the plaintiff or of dismissing him without cause, subject to the liquidated damages. So far, then, the whole matter was made by both parties executory. The plaintiff was still bound

to the performance of the contract, if the defendant should require him. The defendant had still his option. Both parties had mutually withdrawn all executed understandings, and rested in executory propositions. And it is idle now to say, when both parties were acting under the contract, and in recognition and contemplation of it, on mutual propositions between them, on October 28th, after the two first letters had passed between them, that the contract was waived and rescinded by an unexecuted memorandum of October 24th. Again, on purely technical grounds, this contract under seal was not waived or rescinded. (1.) The contract, having been in part executed, could not be validly released or rescinded without consideration, actually paid or implied by seal. Here was, in every aspect of the case, a large amount of compensation earned by the plaintiff from the defendant under the contract. No consideration is pretended for a release. And a release by construction of parol, without consideration, will not be implied. Such a release by implication would be unjust, and will not be favored. (2.) A sealed instrument can be released only by a sealed instrument. 13 Wend., 71; 21 id., 628; 23 id., 82. A case was cited on the other side below, 20 Eng. C. L. R., 126, but in that case the instrument was not under seal. Another case was cited in 6 Johns., 224, but the application of that case is explained away in the case already cited from 23 Wend. It is dangerous to allow the release or rescission of solemn executed contracts, or executory contracts in part executed, under seal, by construction or intendment of parol. Under such a rule of release, the most solemn contract would never be safe against the uncertainties and ambiguities of parol. (3.) It is claimed for the defendant, that he had a right to accept a waiver of the contract by following the advice given by the plaintiff in the written memorandum of October 24, 1861. Concede that, and yet the contract is not waived; for the defendant did *not* follow the advice given to him. It is conceded by the other side, that the plaintiff has some rights, either in the recov-

ery, or dependent upon the solvency of the defendant, which depended on the recovery. So that if the plaintiff should leave the case, he would still have had an interest in the defendant's success, and in the measure of it. He and Mr. Carpenter, in making the contract, did not trust wholly to the labor of either, but to the labor of both ; and when the plaintiff advised the defendant to dismiss one, he coupled that advice with the direction to employ another gentleman in the stead of the one to be dismissed. If Mr. Carpenter should be dismissed, the plaintiff who had not before trusted entirely to himself, wanted a substitute for Mr. Carpenter, with whom to share the labor and responsibility. If himself should be dismissed, as he had not before relied wholly on Mr. Carpenter, so, upon his own dismissal, he was equally unwilling to rely wholly on Mr. Carpenter, and directed the employment, in his own place, of some other gentleman. The defendant did not follow this advice. He did dismiss the plaintiff, but he did not employ any one else in his stead. The whole memorandum of advice is to be taken together; and so taken, it is clear that the plaintiff's view was this : that the case needed two counsel, that it was unsafe in the hands of two counsel who could not consult together; that it would be safer with two who would consult together—not that it would be safer with the gentleman who refused to consult, and who considered consultation unnecessary.

*By the Court*, COLE, J. When this case was before us on a former appeal, we decided that the agreement set forth in the complaint was not champertous under our statute ; that so far as the counsel retained by it were concerned, it was not joint but several in its nature, so that a discharge of one of the counsel without cause from the control of the action was a breach of the contract by the defendant, for which he was liable thereon to the counsel discharged ; and that the fifteen thousand dollars named in the agreement, which the defendant

covenanted to pay each one of his counsel in case he settled, compromised, discontinued or took his suit out of court, or from the control of his counsel, was not a penalty, but a stipulated sum agreed to be paid in lieu of damages of an uncer. tain and doubtful character. It is not proposed to enter at this time into a discussion of the points decided on the former appeal. We are fully satisfied with the conclusions which have been already announced upon the questions submitted, and if we were not, clearly those points are not now open for review. For, so far as this cause is concerned, they have become *res adjudicatœ*, and could not now be reversed or departed from without a violation of well established principles of law.

We thought it best to make these observations for the purpose of relieving ourselves from the necessity of particularly considering some questions discussed on the argument by the counsel for the appellant, but which, for the reason just stated, cannot arise on this appeal.

Because the relation of solicitor and client existed when the contract sued on was entered into, it is claimed that the court should scrutinize its stipulations with the utmost rigor, and if there is anything harsh or inequitable in the contract, or suspicious in the time and manner of its execution, should refuse to sustain an action upon it. Any contract with or security given by the client to the solicitor, it is said, is regarded with suspicion, and when advantageous to the solicitor, the presumption is that the transaction is unfair, and the onus of proving its fairness is upon the solicitor. Applying this wholesome rule of law to the case, there is no ground for holding that the contract should be avoided because the respondent abused his relation as counsel or solicitor, and obtained an undue advantage in consequence of the confidence reposed in him by his client. There is nothing about the contract when intrinsically considered, or in the circumstances attending its execution, which will justify the inference that the respondent used any influence to induce his client to enter into this

contract, or that he surprised or overreached him in any way by superior diligence or ability. On the contrary, it does most satisfactorily appear in the case, that the respondent was not over anxious to enter into the contract in the first instance, and, even if we assume, what is not very clearly shown by the evidence, that he drew the contract, still his client had full opportunity to consider it in all its bearings before he executed it. That client was a man of intelligence and discretion, a member of the bar of a neighboring state, and fully qualified to guard his own interests. He had commenced a litigation which, it was clear to all, would be tedious, difficult and expensive. The amount of his recovery, even if successful, was a matter of doubt and uncertainty. He was poor and unable to take the whole risk and hazard of the litigation. He therefore thought best to enter into a contract to pay his counsel a given sum only in the event he was successful in the litigation, and in case ten per cent. on the value recovered should exceed the sum of ten thousand dollars, then he was to pay each counsel such additional sum, as with five thousand dollars to be paid each should make an amount equal to ten per cent. of the value recovered. This contract for contingent compensation was deliberately entered into by the parties, and we are unable to say, all things considered, that it was not most advantageous to the appellant. True, he agreed, in case he took his cause from the contról of either counsel, to pay them the sum of fifteen thousand dollars each. It is said that this amount is unreasonable, and out of all proportion to the value of the services rendered. Assuming, for the purposes of the argument, that the appellant entered into an improvident stipulation upon this point, yet certainly he could save himself harmless upon it by simply keeping, in good faith, the contract he had made. He was under no obligation—it does not appear that he was under any necessity—to discharge the respondent from his retainer. Whether the respondent waived or lost any right growing out of the breach of the contract, in

consequence of the advice he gave his client when Mr. Carpenter refused to hold any further consultation with him out of court in regard to the cause they were prosecuting, will be considered in another part of this opinion. We are now considering whether there is anything in the contract itself, or in the circumstances under which it was made, which shows that the respondent abused his relation to secure an undue advantage over his client. And we must say that we see nothing whatever in the transaction which shows that a court should refuse to enforce any condition of the contract upon that ground.

It is further claimed that the evidence fails to show that the suit has been taken from the control of the respondent as counsel, and it is argued that his relation to the cause could only be terminated by an order of court, unless *Mr. Ryan* saw fit to withdraw from it of his own accord. Whether, indeed, as a general rule, an order of court is necessary to terminate the relation of an attorney, solicitor or counsel to a cause pending in court, we shall not now stop to enquire, since we are fully satisfied that the suit was taken from the control of the respondent, and he discharged from employment therein, within the spirit and meaning of the contract. In the letter of October 27th, 1861, which the appellant addressed the respondent, the suit is taken from the control of the latter, in language as unequivocal as it well can be. For he says in that letter, after speaking of his inability to change the purpose of Mr. Carpenter to have no further consultation with the respondent in regard to the suit out of court; of the advice which the respondent had given him in view of this position of Mr. Carpenter; of the importance of the suit to him, and the familiarity of Mr. Carpenter with the facts and details of it: " I am forced from your instructions so faithfully and disinterestedly given, and from the stand taken by Mr. Carpenter, to ask you to take no further part in the case, but to leave it to me and Mr. Carpenter." This distinct and pointed request that

the respondent take no further part in the conduct of the cause, was certainly taking it from his control, if it was in the power of the appellant to accomplish that object. It must be construed as having the effect of terminating the respondent's connection with the cause, within the meaning of the contract, and of absolutely discharging him from his retainer therein.

It is further insisted that the breach of the contract was not proven as alleged; that the complaint averred that the suit was taken from the control of the respondent *and* Carpenter (following the precise language of the contract), while the proof showed that it was only taken from the control of the respondent. Assuming that the breach should properly have been alleged in the disjunctive instead of the conjunctive, yet we think it is too late to raise that question for the first time here. Had the objection been taken in the court below, it would have been the clear duty of the court to amend the complaint so as to make its allegations conform to the evidence offered on the trial. The question whether the contract was several in its nature, and whether the discharge of the respondent from retainer and employment in the suit constituted a breach of it, had already been decided in the affirmative by this court. The objection that the *allegata* and *probata* do not agree in this particular, is an exceedingly technical objection, does not effect the merit of the controversy, and ought not to prevail here at this stage of the cause, when it was not raised in the court below, where it might have been obviated by an amendment, if necessary.

Again, it is claimed and insisted that what took place between the parties at and about the time the respondent was discharged from his retainer, amounted to a waiver and rescinding of the contract, and authorized the appellant to conclude that if he elected to discharge the respondent he would not be required to pay the fifteen thousand dollars, but might settle for the professional services rendered upon the *quantum meruit.* We do not think the evidence sustains any such position. We

shall not, however, go into any lengthy discussion of the testimony bearing upon this point, but shall content ourselves with stating briefly the conclusion at which we arrived upon it. According to our view of the testimony, the respondent neither by word or deed gave the appellant any reason to believe that he would not or did not intend to insist upon the provisions of the contract in the event he was dismissed from the suit. When shown the letter which Mr. Carpenter had addressed the appellant, in which Mr. Carpenter, for reasons which he gave, stated that he would have no further consultation with the respondent out of court in the case of *Martin v. Brooks*, the respondent gave the written advice where he said : " I advise *Mr. Martin* that it will be highly dangerous to his interests, if Mr. Carpenter and myself retain our present relations to his case, without constant consultation out of court upon the various questions arising, and the policy to be pursued. I advise *Mr. Martin* that such refusal, if adhered to, is as much a violation of Mr. Carpenter's duty under his retainer, as if he refused to appear in the case in court, or to do any other professional service in the case. I advise *Mr. Martin* that it is essential to his interests either to induce Mr. Carpenter to withdraw his refusal, or dismiss one or other of us, as he may elect, from the case, and employ some other gentleman with whom his remaining counsel can and will consult." If there was any waiver or rescission of the contract by the respondent, it must be found in the above written advice. And yet there is nothing in this written advice which, under any fair construction, can be said to be a waiver of the provisions of the contract, or the stipulation for the payment of the fifteen thousand dollars liquidated damages. But assuming that the appellant might possibly, on reading the last clause in the above memorandum of advice, have derived the impression that the respondent did not intend to hold him to the contract in the event that he should elect to dismiss him from the suit, yet most certainly every impression of that kind must have been

fully removed in the subsequent correspondence, and more particularly in his interviews with respondent's attorneys. For he was there told that if he dismissed the respondent without cause, he would do so subject to the liability to pay the fifteen thousand dollars. But the appellant had no reason—no ground for believing that he would not be held to a rigid accountability on his contract. All the dealings of the respondent with him, even under circumstances of no little delicacy and personal embarrassment, were very plain, direct and unequivocal. There is not the slightest pretense or ground for saying that the respondent misled him by holding out the idea that he was ready to abandon the contract, or that he left him in doubt as to his own views and purposes. He advised the appellant as fully, probably, as any high minded lawyer would do, as to the course he had better pursue, in view of the contingency that Mr. Carpenter should adhere to the position he had assumed. It could hardly be expected, we think, that the respondent should advise his client to dismiss Mr. Carpenter on account of his refusal to hold consultations out of court. He could only give him his honest views as to the necessity of such consultations, and leave the appellant to take such a course in the premises as he might think proper. This, it appears, he did do, candidly and fully. There is, therefore, no ground for saying that the appellant was misled by the respondent in any manner. For the whole case abundantly shows that the latter did nothing, and said nothing, inconsistent with the highest professional honor and fidelity to his client.

These remarks dispose of all the points in the case we deem material or necessary to be noticed.

The judgment of the circuit court is affirmed.